IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| STANLEY H. CALVIN AND | § | |
| BARBRA A. CALVIN, | § | CASE NO. 05-35925 |
| Debtors | § | Chapter 7 |
| | § | |
| STANLEY H. CALVIN AND | § | |
| BARBRA A. CALVIN, | § | |
| Movants/Debtors | § | |
| | § | |
| v. | § | |
| | § | |
| WELLS FARGO BANK, N.A., | § | |
| Respondent | § | |

**MEMORANDUM OPINION ON DEBTORS' AMENDED MOTION
TO HOLD WELLS FARGO BANK, N.A. TEXAS IN CIVIL CONTEMPT AND
FOR DAMAGES FOR VIOLATION OF AUTOMATIC STAY**

I. INTRODUCTION

This contested matter concerns a national bank's internal policy towards non-borrowing Chapter 7 debtors who have accounts at the bank. Upon learning of the filing of a Chapter 7 petition, Wells Fargo Bank, N.A. (the Bank) automatically places an administrative freeze on all accounts of debtors in excess of $5,000.00. The Bank then sends a letter to the Chapter 7 trustee seeking direction regarding the disposition of the funds.

The Bank followed this procedure when it discovered that Stanley and Barbra Calvin (the Debtors) filed their Chapter 7 petition on April 15, 2005. In their Schedule C, the Debtors declared their bank account exempt and were writing checks on it after filing their petition. Not surprisingly, these checks were not honored. Soon thereafter, the Debtors, convinced that the Bank's freeze violated the automatic stay imposed by 11 U.S.C. § 362, filed the instant Amended Motion to Hold the Bank in Civil Contempt and for Damages for Violation of Automatic Stay.[1]

---

[1] The Debtor's Amended Motion differs from the initial motion in one respect only: it contains a paragraph required by local Bankruptcy Rule 9013(b) giving notice of the deadline to object to the relief sought. Not surprisingly, the Bank timely lodged an objection.

The Bank says that it has done nothing wrong. Indeed, the Bank emphasizes that its policy is a sound one that benefits the bankruptcy system because the freeze ensures that debtors will not use the funds until the time has passed for the Chapter 7 trustee and any creditor to challenge any claimed exemption to the funds.[2] The Debtors contend that the Bank has no business freezing funds because: (1) they have claimed the funds as exempt under federal law; and (2) they have not borrowed one red cent from the Bank, and therefore the Bank has no set off right against them. The Debtors argue that pursuant to 11 U.S.C. § 542(a), the Bank should have immediately delivered the funds to Ronald J. Sommers, the Chapter 7 trustee in this case (the Trustee). Had the Bank done so, the Debtors apparently contend that they could have quickly negotiated a release of the funds from the Trustee and none of the checks would have bounced.[3]

The Bank, nervous about being sued over an internal policy which potentially affects thousands of accounts of non-borrowing depositors who might wind up in bankruptcy,[4] requests this Court: (1) to bless its policy as being in compliance with § 542[5] and to hold that it is not liable to the Debtors for any violations under § 362; or (2) if the Bank is to be held liable to the Debtors, then to tell the Bank how its policy can be revised to comply with the law. The purpose of this Memorandum Opinion is to address these issues.

## II. FINDINGS OF FACT

The facts, either as stipulated to or admitted by counsel of record, or as adduced from the testimony of the witnesses, in chronological order, are as follows:

1. On April 15, 2005, the Debtors voluntarily filed a Chapter 7 petition. At that time, the Debtors, who had no loans outstanding with the Bank, maintained a checking account at this institution. The Debtors had $4,000.00 in this account at the time of filing. The same day, two deposits were made into the account, bringing the total balance to $8,759.50. The Debtors claimed the $4,000.00 in their checking account as exempt in their original Schedule C. (Docket No. 1).

---

[2] Bankruptcy Rule 4003(b) expressly provides that, *inter alia*, any party in interest may object to any claimed exemption so long as the objection is filed within 30 days after the meeting of creditors.
[3] At the hearing, Mrs. Calvin testified about the problems her husband and she experienced in attempting to communicate with the Bank after the freeze. (Trans., p. 15, lines 7–13; p. 34, line 19 through p. 36, line 21; p. 39, line 1 through p. 40, line 11). Mrs. Calvin's testimony also suggests that her husband and she believed that if the Bank had turned over the funds to the Trustee, their attorney would have been able to convince the Trustee to release the funds to them and therefore no checks would have bounced. (Trans. p. 41, line 11 through p. 42, line 5).
[4] The Bank's senior counsel testified that the Bank has 6,000 to 7,000 deposit customers who file bankruptcy petitions each month. (Trans. p. 47, lines 3-6).
[5] All section references are to 11 U.S.C. unless otherwise noted.

2. According to the Debtors' Schedules, the amounts of their secured claims, unsecured priority claims (taxes), and unsecured non-priority claims are $29,948.38, $14,200.00 and $75,417.00, respectively. (*See* Schedules D, E and F.) (Docket No. 1).

3. The Bank has a policy of ascertaining whether any individuals holding accounts at the Bank have filed for Chapter 7. Should the Bank learn of such bankruptcy filings, it places an "administrative freeze" on any account with a balance exceeding $5,000.00. The Bank takes this action so that debtors cannot withdraw the funds until the Chapter 7 trustee can assess whether the funds are exempt or nonexempt. The Bank wants to avoid drawing a suit from the trustee for allowing a debtor to use any funds belonging to the estate. The Bank does not freeze any account with less than $5,000.00 because it believes any balance below $5,000.00 is of inconsequential value or benefit to the Chapter 7 estate. The Bank also reviews deposits to determine if any funds in such accounts are derived from Social Security payments; the Bank does not freeze funds of this nature.

4. On April 18, 2005, the Bank learned of the Debtors' bankruptcy and notified them by letter that it had placed an administrative freeze on the Debtors' checking account, pending instructions from the Trustee. The amount frozen was $8,320.26. The Bank sent a copy of this letter to the Trustee. (Exhibit A).

5. Post-petition, the Bank returned four checks that the Debtors had written and sent to creditors before filing their petition. In addition, the Debtors, after learning of the freeze, placed a stop on one check to another creditor before that creditor presented the check for payment. These returned or stopped checks totaled $1,456.38. The Debtors incurred $75.00 in returned check fees.

6. On April 27, 2005, the Debtors filed a Motion to Hold the Bank in Civil Contempt and for Damages for Violation of Automatic Stay. Realizing that they had failed to include language required by local Bankruptcy Rule 9013(b) in this motion, the Debtors quickly amended their motion to include this language and, on the same day, filed their Amended Motion to Hold the Bank in Civil Contempt and for Damages for Violation of Automatic Stay (the Motion.) (Docket Nos. 4 and 6).

7. On April 28, 2005, the Bank sent a letter to the Trustee requesting direction on the disposition of the funds in the checking account. (Exhibit B).

8. On May 2, 2005, the Trustee responded to the Bank's April 18 letter by requesting case authority allowing the Bank to place a freeze on the Debtors' account when the Bank was not a creditor. (Exhibit C).

9. On May 16, 2005, the Bank filed a response in opposition to the Motion (the Response). (Docket No. 11).

10. On May 18, 2005, the Trustee responded to the Bank's April 28 letter by stating that he would determine the disposition of the funds in the checking account during the first meeting of creditors to be held on May 25, 2005. (Exhibit D).

11. On May 23, 2005, the Debtors, having become aware of two deposits credited to their account on the date that they filed their petition, amended their Schedule C to exempt $8,760.00 in their checking account. (Docket No. 16).

12. On May 25, 2005, the Trustee hand delivered a letter to the Bank's counsel directing the Bank to turn over the funds from the Debtors' checking account to the Debtors, as there were no objections to their claim of exemption. (Exhibit. E).

13. On May 26, 2005, the Bank released these funds to the Debtors pursuant to the Trustee's direction. (Exhibit. F).

14. In the Motion, the Debtors seek to recover what they assert are actual damages of $8,320.26 for the Bank's alleged violation of the automatic stay by virtue of freezing their account. The Debtors also seek punitive damages of $500,000.00.

15. On June 17, 2005, the Bank filed a Brief in opposition to the Motion (the Brief). (Docket No. 18).

16. The hearing on the Motion and the Response was held on June 21, 2005. Two witnesses testified: (a) Barbra Calvin, one of the Debtors; and (b) Michael Slade, a senior counsel of the Bank.

### III.   CONCLUSIONS OF LAW

**A.   Jurisdiction and Venue**

This Court has jurisdiction pursuant to 28 U.S.C. § 157(b)(2)(A), § 157(b)(2)(O), and § 1334(a). The Motion is a contested matter pursuant to Bankruptcy Rule 9014. Venue of this Chapter 7 case in this district is proper pursuant to 28 U.S.C. § 1408(1).

B.   **Does the Bank's Policy Comply with § 542 of the Bankruptcy Code?**

The Bank fervently argues that it has complied with § 542 and that by so doing, it cannot be in violation of the automatic stay under § 362(a). In the Response, the Bank focused on its compliance with § 542(b); whereas, at the June 21 hearing and in the Brief, the Bank focused more on its compliance with § 542(a). This Court will examine the applicability of these provisions to the case at bar and address: (1) Whether the Bank must satisfy both provisions, or just one?; (2) If just one governs, which one?; and (3) Whether the Bank's current policy complies with the governing language?

1. **Is the Bank subject to 11 U.S.C. § 542(b) and, if so, does the Bank's policy comply with this Section?**

11 U.S.C. § 542(b) reads as follows:

Except as provided in subsection (c) and (d) of this section, an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee, except to the extent that such debt may be offset under § 553 of this title against a claim against the debtor.

The threshold issue is whether the Bank is an "entity" as this term is used in § 542(b). The word "entity" is defined in § 101(15). This definition includes a "person," which is also a defined term under § 101(41). The term "person" includes "corporations" such as the Bank. The combination of the preceding definitions brings the Bank within the purview of § 542 as an "entity"; therefore, the Bank must comply with the provisions of § 542(b). *Matter of Lee*, 35 B.R. 452, 455 (Bankr. N.D. Ga. 1983); *see also In re Motley*, 10 B.R. 141, 143 (Bankr. M.D. Ga. 1981) (holding that a bank is an "entity" under 11 U.S.C. §101).

The next issue is whether the Debtors' bank account is a debt that is property of the bankruptcy estate and is matured, payable on demand, or payable on order. Courts have found that "[p]roperty of the debtor is defined to include 'all legal or equitable interests of the debtor,' § 541(a)(1), and obviously that includes the interest that a depositor has in the money in his account, more precisely the money owed him by the bank by virtue of the account." *In re U.S.A. Diversified Prods., Inc.*, 100 F.3d 53, 55 (7th Cir. 1996) (citing *Sousa v. Bank of Newport*, 170 B.R. 492, 494 (D.R.I. 1994)). Moreover, the debt owed by a bank in the form of an account is payable on demand or on order. Finally, a bank account owned by a debtor automatically becomes property of the estate upon the debtor filing for bankruptcy. *See* 11 U.S.C. §541(a) (1)

5

and *In re Laux,* 181 B.R. 60, 61 (Bankr. S.D. Ill. 1995) (citations omitted). Because a bank account is a "debt [owed by the bank] that is property of the estate and . . . payable on demand," the account falls squarely within § 542(b).

In the case at bar, because the Bank is an entity that owed a debt that was property of the estate and payable on demand, the Bank was required pursuant to § 542(b) to "pay such debt to, or on the order of, the trustee . . ." pursuant to § 542(b). The plain meaning of this language is that the Bank, upon learning of the Debtors' bankruptcy, was required to: (a) immediately pay the funds in the account to the Trustee; or (b) if not immediately, then on the order of the Trustee. The Bank's letters of April 18 and April 28 notified the Trustee that the Bank had frozen the funds in the Debtors' account and requested direction from him as to the disposition of the funds. The Bank thus chose to wait for an order from the Trustee, an action that was entirely in compliance with § 542(b). Under these circumstances, it appears that § 542(b) governs this matter. The Bank's existing policy therefore needs no modification unless § 542 (a) somehow applies and the Bank's policy violates § 542(a).

**2. Is the Bank subject to 11 U.S.C. § 542(a), and, if so, does the Bank's policy comply with this Section?**

This Court believes that § 542(b) takes precedence in application over § 542(a) because § 542(b) specifically concerns a "debt that is property of the estate," while § 542(a) concerns "property of the estate" in general. It is an important principle of statutory construction that a specific term or provision will prevail and will be given effect over a general term or provision. *Lee,* 35 B.R. at 458, (citing Sands, C. Dallas, 2A *Statutes and Statutory Construction,* 57 (rev. 4th ed. of 3rd ed. of *Sutherland Statutory Construction,* 1973); *In re Williams,* 61 B.R. 567, 573 (Bankr. N.D. Tex. 1986). Because § 542(b) appears to be the more specific subsection, it should be controlling in the case at bar and § 542(a) should play no role.

Assuming, however, that this Court is incorrect, it is appropriate to review § 542(a). Indeed, the Debtors firmly contend that § 542(a) applies. (Trans. p. 9, lines 9-20 and p. 18, line 12 through p. 19, line 6). Their argument seems to be that § 542(a) is the more specific provision under the facts in this case, and that therefore § 542(a) controls over § 542(b). Based upon certain points made in the Brief[6] and comments made by the Bank's counsel at the hearing,[7] the Bank, too, apparently believes that § 542(a) might apply.

---

[6] See section 3 of the Brief, beginning on page 8.

6

11 U.S.C. § 542(a) provides that:

> Except as provided in subsection (c) or (d) of this section, *an entity*, other than a custodian, *in possession, custody, or control, during the case, of property* that the trustee may use, sell, or lease under § 363 of this title, or *that the debtor may exempt under § 522 of this title, shall deliver to the trustee*, and account for, *such property* or the value of such property, unless such property is of inconsequential value or benefit to the estate. (Emphasis added.)

Any individual debtor has the right under § 522 to exempt funds in a checking account. *In re Sawyer,* 324 B.R. 115, 121 (Bankr. D. Ariz. 2005). In the case at bar, the Debtors scheduled their account as exempt under the federal wild card exemption statute, 11 U.S.C. § 522(d)(5), a statute which allows individual debtors to exempt an amount greater than the $8,320.26 at issue in the case at bar. Although the funds in the Debtors' account were not yet definitively exempt at the time the Debtors claimed the exemption—the time still had to pass for any party in interest to object to the exemption[8]—the Debtors nonetheless had a colorable claim to the funds as exempt property under § 522. Accordingly, the funds, in the form of a promise by the Bank to pay, constituted "property that the debtor may exempt under § 522 of this title." Because these funds fit into this very specific category of property, § 542(a), not § 542(b), arguably governs:[9] there is property (i.e. funds that may be exempt) which is in the possession, custody or control of an entity (the Bank) during this Chapter 7 case.[10] Therefore, unless certain

---

[7] The Bank's counsel stated that "Under 542, we are not a custodian. We are an entity that holds funds that's property of the estate, and it's mandatory. We shall turn it over to the Trustee, unless it's of inconsequential value." The language cited by the Bank's counsel is from §542(a), not § 542(b). The fact that the Bank's counsel felt compelled to make this argument in his presentation suggests that the Bank itself is concerned that § 542(a) might govern this dispute. (Trans. p. 28, lines 14-18).

[8] Bankruptcy Rule 4003(b) expressly provides that, *inter alia*, the deadline for any party-in-interest to object to any exemption claimed by a debtor is thirty days following the first date set for the meeting of creditors. Hence, even though a debtor may claim certain property as exempt, the exemption does not become final until the deadline for lodging objections has passed. *In re Williams*, 249 B.R. 222, 223 (Bankr. D.C. 2000) ("The debtor exempted the account, but that exemption has not become final because the time for objections has not expired."); *In re Pimental*, 142 B.R. 26, 29 (Bankr. D. R.I. 1992)("Therefore, when debtors filed their Chapter 7 petition, the funds on deposit with the [bank] became property of the estate, and did not revert to the Debtors until said funds were properly claimed and allowed as exempt property.")

[9] Assuming that § 542(a) governs in cases like the one at bar—i.e. non-borrowing individual debtors with an account at a financial institution—§ 542(b) would apparently govern where the Chapter 7 debtor is (a) an individual not only with an account at the bank, but also loans from the bank (which therefore gives the bank a set off right and brings § 542(b) into play); (b) a corporation with both an account at and loans from the bank (which once again gives the bank a set off right and brings § 542(b) into play); and (c) a corporation with an account at, but no loans from, the bank; because corporations may not exempt property, the very specific "may exempt" section of § 542(a) is inapplicable, and therefore § 542(b) applies.

[10] There is no question that the Bank was in possession, custody, or control of the account. The fact that the Bank had the ability to transfer the funds to the Trustee indicates that the Bank had possession, custody or control over

exceptions apply, the Bank would be required pursuant to the plain meaning of § 542(a) to actually deliver the funds to the Trustee, instead of simply freezing the funds, keeping them on deposit at the Bank, and informing the Trustee that the Bank was looking to him for direction as to the disposition of the funds.

### a. Do any exceptions apply?

Although the Bank is an entity under § 542(a) for the same reasons discussed with respect to § 542(b) above, § 542(a) does not apply if the Bank is a "custodian." At the hearing, counsel for the Bank conceded: "Under § 542 we are not a custodian." (Trans. p. 28, lines 15-16). Accordingly, unless some other exception applies, the Bank is an entity that must comply with § 542(a) and deliver the funds to the Trustee.

One exception is that property of inconsequential value or benefit to the estate does not need to be delivered. 11 U.S.C. § 542(a). In the case at bar, the amount of the secured claims in the Debtors' bankruptcy was $29,948.38; the amount of priority (tax claims) was $14,200.00; and the amount of the unsecured claims was $75,417.91, for a total claim amount of $119,566.29. The funds in the Debtors' bank account ($8,320.26) was a significant portion of the amount of the secured claims (28%), was an even more significant portion of the amount of priority tax claims (59%), and was not an insignificant portion of the total of the unsecured claims (11%) and the total of all claims (7%). As such, it would be an untenable position to argue that at the time of the freeze, the Debtors' account—which contained entirely unencumbered funds—was of inconsequential value or benefit to this Chapter 7 estate; *See Mele v. First Colony Life Ins. Co.*, 127 B.R. 82, 85 (D.C. 1991) (stating that the abandonment provisions in the Bankruptcy Code are designed to relieve the trustee of the financial burden of administrating inconsequential assets that would cost more than they are worth to the estate, but then emphasizing that a trustee may not abandon assets that will satisfy debts owing to creditors). That the Trustee eventually chose not to oppose the Debtors' claimed exemption to the funds does not alter this conclusion.

Another exception occurs when an entity possesses a right of set off. 11 U.S.C. § 542(b) (2004). The Debtors' bank account was a debt owed by the Bank, and through their bankruptcy filing this debt became property of the estate. Section 542(b) provides that an entity owing a debt

---

this account. *In re U.S.A Diversified Products, Inc.*, 193 B.R. 868, 874 (Bankr. N.D. Ind. 1995), *aff'd*, 150 F.3d 53 (7th Cir. 1996).

8

that is property of the estate does not have to pay the trustee "to the extent that such debt may be offset under § 553." However, as the Debtors owe no debts to the Bank such that the Bank may claim a right to set off, this exception does not apply here.

A further exception to the mandatory turnover required by § 542(a) exists when an entity has neither actual notice nor actual knowledge of the commencement of the case. 11 U.S.C. § 542(c) (2004). The Bank placed the administrative freeze on the Debtors' account specifically because it had actual notice and knowledge of the Debtors' Chapter7 filing; therefore, the Bank does not fall within this exception.

The final exception to the mandatory turnover provision is for life insurance companies. *See* 11 U.S.C. § 542(d) (2004). This exception does not apply to the Bank.

All in all, because none of the exceptions discussed above apply, the Bank had no choice under § 542(a) but to immediately deliver the funds (i.e. $8,320.26) to the Trustee. The Bank could not, as it is allowed to do under § 542(b), freeze and hold the funds and then look to the Trustee for direction. Delivery of the funds was required.

**b. What is the meaning of "deliver" under § 542(a)?**

At the hearing, the Bank's senior counsel testified that the Bank's understanding of the law is that after freezing the funds, the Bank was required to "tender" the funds to the Trustee. (Trans. p. 48, lines 1-8). If this testimony concerned the Bank's understanding of the requirements imposed by § 542(a), then this Court believes the Bank misconstrued the law.[11]

Section 542(a) does not expressly define the meaning of the word "deliver", nor is there any other provision of the Bankruptcy Code setting forth the meaning of this word. There is, however, one provision of the Bankruptcy Code that appears to shed light on the meaning of "deliver" and how it is distinguishable from the meaning of "tender". Section 766, which is entitled "Treatment of customer property," states:

> (b) The trustee shall prevent any open commodity contract from remaining open after the last day of trading in such commodity contract, or into the first day on which notice of intent to *deliver* on such commodity contract may be *tendered*, whichever occurs first…the trustee may operate the business of the debtor for the purpose of--

---

[11] The Court has reviewed the transcript of the hearing and believes that the testimony given by Mr. Slade probably concerns the Bank's understanding of the requirements of solely § 542(b). However, Mr. Slade's testimony is not entirely clear on this point. It is possible that Mr. Slade was testifying about the Bank's understanding of both § 542(a) and § 542(b). Out of an abundance of caution, this Court will assume that the testimony concerned the Bank's understanding about the requirements of both sections.

9

>  (1) accepting or making *tender* of notice of intent to *deliver* the physical commodity underlying such commodity…

11 U.S.C. § 766(b) (emphasis added). Applying the Supreme Court's plain meaning rule as articulated in *Connecticut Nat'l. Bank v. Germain*, 503 U.S. 249, 254 (1992), § 766(b)'s separate and distinct use of "tender" and "deliver" indicates that "tender" does not mean "deliver." The two words are not interchangeable.

In addition to reviewing other provisions of the Code for a definition of "deliver", one court has looked to state law for assistance in defining this word under § 542(a). *In Re Janmar, Inc.*, 4 B.R. 4, 10 (Bankr. N.D. Ga. 1979). In the case at bar, Texas law governs. The TEXAS BUSINESS AND COMMERCE CODE (Texas B&C Code) distinguishes between "deliver" and "tender." Chapter 2 defines "tender" as:

> (a) Tender of delivery requires that the seller put and hold conforming goods at the buyer's disposition and give the buyer any notification reasonably necessary to enable him to take delivery.

TEX. BUS. & COM. CODE Ann. § 2.503(a) (Vernon 1987). Under Chapter 1, "delivery," "with respect to an instrument, document of title, or chattel paper, means voluntary transfer of possession." *Id.* at § 1.201(b)(15). The Texas B&C Code thus distinguishes between "tender" and "delivery" by setting forth that "delivery" requires a change in possession of the property while "tender" is merely a notification of the availability of the property.

Aside from looking to state law, some courts have determined the meaning of "deliver" by relying upon a dictionary. *In re Shur*, 184 B.R. 640 (Bankr. E.D.N.Y. 1995). Although this approach was done outside the context of § 542(a), it is nevertheless instructive in the case at bar. An examination of the meaning of "tender" and "deliver" in a dictionary indicates that the words do not have the same meaning. "Tender" is defined as:

> An offer of money. The act by which one produces and offers to a person holding a claim or demand against him the amount of money which he considers and admits to be due, in satisfaction of such claim or demand, without any stipulation or condition.

BLACK'S LAW DICTIONARY 1315 (5th ed. 1979).

"Delivery" is defined as "[t]he act by which the *res* or substance thereof is placed within the actual or constructive possession or control of another." BLACK'S LAW DICTIONARY 385 (5th ed. 1979). "Actual and constructive delivery" are defined under "delivery" as:

10

> Actual delivery consists in the giving real possession to the vendee or his servants or special agents who are identified with him in law and represent him. It is a formal immediate transfer of the property of the vendee.
> Constructive delivery is a general term, comprehending all those acts which, although not truly conferring a real possession of the thing sold on the vendee, have been held, by construction of law, equivalent to acts of real delivery.

BLACK'S LAW DICTIONARY 385-86 (5th ed. 1979).

Actual delivery in the context of this case would have occurred if the Bank had put a check for $8,320.26 into the hands of the Trustee. The Bank would then have relinquished possession of the funds and the Trustee would have possessed a check in hand. Constructive delivery would have occurred if the Bank had sent a check to the Trustee's business partner or law partner. In the latter scenario, the Trustee would not have physical possession of the funds, but his agent would. *See Stewart & Stevenson*, 737 S.W. 2d 65, 67 (Tex. App. – San Antonio 1987) ("It follows that El Dorado was an agent for the joint venture when it took possession of the generator from S & S and delivery of the generator was constructive delivery to K-2 as well."). Even though the Trustee would only have constructive possession of the funds, the important aspect of constructive delivery distinguishing it from a tender, i.e., the Bank relinquishing possession, would have occurred. Thus, actual or constructive delivery is not the same as tender: tender is merely an offer, whereas actual and constructive delivery involve a change in possession.

Because the Bank's "tendering" of the funds (i.e. freeze, hold, and ask the Trustee for instructions) is not the same as "delivering" the funds (i.e. transfer possession to the Trustee by way of check or wire transfer), this Court holds that the Bank has failed to comply with § 542(a).

### c. Given the definition of deliver, what should Wells Fargo have done to comply with § 542(a)?

Courts have held "[t]he duty to turn over [or deliver] the property is not contingent upon any predicate violation of the stay, any order of the bankruptcy court, or any demand by the creditor." *In re Knaus*, 889 F.2d 773, 775 (8th Cir. 1989); *In re U.S.A. Diversified Products, Inc.* 193 B.R. at 872. In fact, "[t]here is no requirement in the Code that the trustee make a demand, obtain a court order, or take any further action in order to obtain a turnover [delivery] of the estate's property." *Id.* (citations omitted); *In re Bidlofsky*, 57 B.R. 883, 900 (Bankr. E.D. Mich. 1985). The obligation "is self-operative and mandatory." *In re U.S.A. Diversified*

11

*Products, Inc.*, 193 B.R. at 872 (quoting *In re Larimer*, 27 B.R. 514, 516 (Bankr. D. Idaho 1983)). Under the circumstances in the case at bar, the Bank had a duty to immediately deliver the money directly to the Trustee rather than freezing and holding on to the funds pending instruction from the Trustee. The Bank could have fulfilled this duty by closing the Debtors' account and remitting the funds by check or wire transfer to the Trustee. By not doing so, the Bank failed to comply with § 542(a).[12]

### C. Assuming that § 542(a) applies instead of § 542(b), is the Bank liable to the Debtors due to the Bank's failure to comply with § 542(a)?

As noted previously, this Court believes that § 542(b) governs the dispute at bar and further believes that the Bank has complied with this particular section. This Court therefore believes that the Bank's failure to comply with § 542(a) is of no moment. However, if this Court is incorrect and § 542(a) controls rather than § 542(b), is the Bank liable to the Debtors due to its failure to comply with § 542(a)? This Court holds that the Bank is not liable for any one of three reasons.[13]

#### 1. The Debtors have no standing to sue the Bank.

As a rule, a trustee, and only a trustee, has standing to prosecute causes of action on behalf of the bankruptcy estate. *Wieburg v. GTE Southwest Inc.*, 272 F.3d 302, 306 (5th Cir. 2001) (citing *In re Educators Group Health Trust*, 25 F.3d 1281, 1284 (5th Cir. 1994)). In the case at bar, the funds in the account constituted property of the estate during the actions about which the Motion complains. *In re Laux*, 181 B.R. at 61; *See In re Briggs*, 143 B.R. 438, 447 (Bankr. E.D. Mich. 1992). Because these funds belonged to the estate, any cause of action for improper handling of the funds belonged to the Trustee, not the Debtors. The Debtors therefore have no standing to seek any relief from the Bank for its freezing of the account.

An exception to this general rule about standing exists under certain circumstances. A Chapter 7 debtor has standing to bring a cause of action if: (1) "the [t]rustee unjustifiably refuse[s] to bring the action against the [d]efendant;" (2) the debtor obtains a leave of court to sue; and (3) the debtor has a colorable claim. *In re Price*, 173 B.R. 434, 441 (Bankr. N.D. Ga.

---

[12] The legislative history of § 542(a) expressly states that any entity "is required to deliver property of the estate to the trustee…whenever such property is acquired by the entity during the case…" The history further states that the only way an entity may avoid delivery of property to the trustee is for the entity to obtain an order from the court. 124 Cong. Rec. 32399-32400 (1978). This history is further support for the position that the meaning of "deliver" in this statute is to transfer possession, not retain possession and notify the trustee.

[13] The Court would also note that if § 542(b) rather than § 542(a) applies, the Bank is not liable to the Debtors for the same reasons articulated herein.

12

1994). In *Price*, the court held that all three of these components were missing. First, nothing in the record proved that the trustee refused to bring the action against the insurance company. In fact, the record showed that the trustee did not object in the bringing of the action. Second, the court found that the "lack of court authorization is fatal to a claim of standing to act on behalf of the trustee." *Id.* at 441. Because the plaintiff did not obtain authorization from the court, she had no cause of action. Third, the court held that even if the debtor had requested the court's permission to prosecute her claim, the debtor had shown no injury. *Id.*

Similar to *Price*, the Debtors here fail to satisfy even one of the three elements for standing. First, nothing in the record shows that the Trustee unjustifiably refused to bring a motion for contempt against the Bank. In fact, the Debtors testified they did not personally contact the Trustee for any purpose. (Trans. p 41, line 11 through p. 42, line 5). Second, the Debtors did not ask permission from this Court to bring the Motion against the Bank. Third, even if the Debtors had requested permission to bring the Motion, this Court would have rejected their request because the Debtors suffered no injury.

The Debtors suffered no injury because at the time the Bank froze the funds, they did not belong to the Debtors despite their claiming the funds as exempt in Schedule C. When a debtor files a Chapter 7 petition, the debtor "is automatically 'divested of virtually all property interests held as of the commencement of the case and, in turn, these interests immediately vest in the estate.'" *In re Pimental*, 142 B.R. 26, 28 (Bank. D.R.I. 1992) (quoting *Commercial Credit Bus. Loans, Inc. v. Northbrook Lumber Co.*, 22 B.R. 992 (N.D. Ill. 1982)). This divestiture means that the debtor loses any title to, and is prohibited from, using the estate's assets for any purpose. *In re Laux*, 181 B.R. at 61. Title does not revest in the debtor until the property is either "properly claimed and allowed as exempt, or abandoned by the trustee." *Id.* In *Laux*, the court found that at the time of the freeze, the funds were property of the estate and subject to the control of the trustee. *Id.* at 61 n.1. Therefore, "the only party with standing to raise a violation of § 362(a)(3) is the trustee." *Id.* Indeed, the Fifth Circuit has stated that not until the period of time has passed for objecting to a debtor's proposed exemptions does the property become exempt and, once again, subject to the debtor's control. *See In re Luengo*, 259 F. 3d 323, 340 n. 3 (5th Cir. 2001).

Similar to *Laux*, when the Debtors filed their Chapter 7 petition, title to all money in the checking account passed to the bankruptcy estate and therefore to the Trustee. The Trustee did

13

not immediately abandon the account or consent to the Debtors' use of the account funds by virtue of the Debtors having claimed the account as exempt. Hence, during the period when the checks were bouncing, the money in the checking account still belonged to the estate, and therefore the Trustee was the only party with standing to bring a claim regarding a violation of § 362(a).

The fact that the Trustee eventually decided not to object to the Debtors' claimed exemption does not change this conclusion. At the time the Bank froze the account and dishonored the checks, the Trustee had not made any decision on whether to object to the Debtors' claimed exemption. If the Bank had honored the checks, and the Trustee had thereafter successfully objected to the exemption, the Bank would assuredly have been liable to the Trustee for the amount of funds spent by the Debtors. *In re U.S.A. Diversified Products, Inc.*, 193 B.R. at 879, ("What this means in a Chapter 7 is that if an entity in possession of estate property receives notice of the bankruptcy filing but nonetheless transfers the property to anyone other than the trustee, it does so at its peril. In the absence of the property of itself, the trustee in such instance is entitled to recover the value of the estate property from the entity making the transfer."); *In re Borchert*, 143 B.R. 917, 919 (Bankr. D.N.D. 1992); *Air Atlanta, Inc. v. National Bank of Georgia, Inc.*, 81 B.R. 724, 725-26 (Bankr. N.D. Ga. 1987). The Bank cannot be expected to look into a crystal ball and predict what this Trustee—or any trustee—will do in the future. The Bank can only act on the facts at hand when checks are presented. If the appointed Chapter 7 trustee has not made any decision when checks signed by debtors are presented for payment, the Bank has no choice but to dishonor the checks if it wants to avoid exposure to the estate.

### 2. Even if the Debtors do have standing, there is no violation of the automatic stay.

Even if the Debtors do have standing to assert claims against the Bank, they cannot prevail on the merits in this case. The Debtors argue that the Bank's administrative freeze on their account violated the automatic stay pursuant to § 362(a)(3) and (a)(7). This Court disagrees.

The Supreme Court has held that an administrative freeze on an account, which is a promise to pay, does not violate § 362(a)(3) because the freeze constitutes neither a taking of property from the debtor nor an exercise of dominion over the debtor's property. *Strumpf*, 516

U.S. at 21. Accordingly, the administrative freeze, which the Bank placed on the Debtors' account, did not violate § 362(a)(3).

*Strumpf* also stands for the proposition that an administrative freeze is not a violation of 11 U.S.C. § 362(a)(7):

> In our view, [an administrative freeze] was not a set off within the meaning of § 362(a)(7). Petitioner refused to pay its debt, not permanently and absolutely, but only while it sought relief under § 362(d) from the automatic stay.

*Id.* at 19.

As a creditor, the financial institution in *Strumpf* possessed the right of set off and placed an administrative freeze on the debtors' account while it pursued a lifting of the automatic stay in order to minimize its losses and exercise its set off rights. *Id.* In the case at bar, the Bank did nothing more than its counterpart in *Strumpf*: it froze the account while awaiting a decision from the Trustee as to the disposition of the funds (similar to the bank in *Strumpf* awaiting the court's decision on its motion to lift stay).

The Debtors argue that *Strumpf* is inapplicable because the Bank did not have the right to set off. They cited no authority for this view. Nor does this Court see any logic in the argument. Indeed, if anything is inapplicable, it is § 362(a)(7) upon which the Debtors rely. This section solely prohibits acts taken to set off. Because the Bank was not a creditor in this case and therefore had no set off rights, § 362(a)(7) is wholly inapplicable. The Bank cannot violate a statute when the very circumstances proscribed by the statute are not present.

For all of these reasons, this Court concludes that the Bank's administrative freeze upon notice of the filing of Debtors' petition was neither a violation of § 362(a)(3) nor § 362(a)(7).

### 3. Even if the Debtors have standing to sue and the Bank violated the stay, the Debtors have no damages.

Even if the Debtors had standing to sue the Bank, and even if the Bank violated the automatic stay, the Debtors would still not be entitled to recover anything under the statute upon which they rely, § 362(h). This provision provides as follows:

> An individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages.

The only actual damages proven up at the hearing was $75.00 for the returned check fees; and the testimony from the Bank's senior counsel was that the Bank has already reimbursed the

Debtors for this amount. (Trans. p. 49, line 10-15). Actual damages would *not* include the $8,320.26 claimed in the Motion. The $8,320.26, even though initially frozen, was eventually returned to the Debtors, so they cannot possibly claim that amount as actual damages. Other costs incurred while the money was frozen would qualify as actual damages; however, no such costs were either pled or proven.[14] Moreover, the Debtors' attorney presented no evidence of his attorney's fees to this Court, so this Court cannot award such fees.

Nor are punitive damages in order. For punitive damages to be awarded under § 362(h), "appropriate circumstances" must exist. The cases interpreting "appropriate circumstances" indicate that egregious, intentional conduct must have been committed. *Lovett v. Honeywell, Inc.*, 930 F.2d 625, 628 (8th Cir. 1991); *In re Jackson*, 309 B.R. 33, 40 (Bankr. W.D. Mo. 2004). Additionally, courts consider the extent of harm suffered by the debtor. *In re Solfanelli*, 230 B.R. 54, 70 (M.D. Pa. 1999).

The facts and circumstances in the case at bar do not come within hailing distance of justifying the imposition of punitive damages. The Bank was not acting in bad faith when it froze the funds; indeed, the Bank genuinely believed it had to do so to comply with the law (i.e. § 542). Moreover, the Bank did not simply freeze the account and keep quiet. In its April 18 letter to the Debtors (a copy of which was sent to the Trustee), the Bank immediately notified the Debtors and the Trustee as to the action that it had taken and requested direction from the Trustee regarding what to do with the funds. Then, when the Trustee did not respond, the Bank sent another letter directly to him and had its counsel call him as well. The Trustee still did not make a decision as to disposition of the funds. The Bank should not be punished for the Trustee's refusal to either take control of the funds or abandon the estate's interest in them. Further, the Debtors suffered virtually no damages; and the few damages that they proved up—$75.00 in charges for returned checks—have already been repaid to the Debtors. These are hardly the "appropriate circumstances" that warrant imposition of punitive damages.

---

[14] Mrs. Calvin testified that the Debtors had to borrow some money while they were waiting for the funds in their account to be released (Trans. p. 38, lines 3-5). Yet, she gave no testimony whether her husband and she paid any interest on these loans; and it is the amount of any such interest that would be the measure of damages.

## IV. CONCLUSION

Under the Bankruptcy Act of 1898, entities owing debts such as the Bank were shielded from liability even if they paid a debtor post petition as long as the entities were "acting in good faith." Bankruptcy Act of 1898, ch. 7, § 70(d)(2) (repealed 1978). The Bankruptcy Reform Act of 1978 eliminated this protection with the passage of § 542. Entities owing a debt now have exposure to Chapter 7 trustees if payment on the debt is made to a debtor because that debt is owed to the estate until such time as it is abandoned or any exemption becomes final. Under these circumstances, it makes good business sense for the Bank to have instituted a policy that freezes the accounts of depositors who file a Chapter 7 petition. In this manner, the Bank can shield itself from any liability to a trustee while that trustee determines whether the funds are exempt or nonexempt (or, even if nonexempt, of inconsequential value to the estate). It is its potential exposure to trustees, not to debtors, upon which the Bank must properly focus.

No debtors, and certainly not the Debtors in the case at bar, have any standing to complain about freezing of the funds. Once they file their Chapter 7 petition, the funds are no longer theirs to spend. Even if they claim the funds as exempt, they have no right to spend them until the period has passed for lodging objections to the claimed exemption. It is incumbent on the debtors' bar to properly counsel their clients about the pitfalls of filing a Chapter 7 petition when any client has significant cash in a bank account. The putative debtor needs to understand that as soon as the petition is filed, the right to use the funds ceases either (a) forever, if the funds are nonexempt (unless abandoned); or (b) if the funds are claimed as exempt, for several weeks until the period to object to exemptions has expired. In the case at bar, the Debtors were simply not entitled to spend the funds on deposit when they filed their petition; the time to object to their claimed exemptions had not yet passed. Accordingly, the frustration that they experienced once their checks began bouncing was entirely of their own doing.

Having frozen the account, the key issue for the Bank is whether it acted properly by informing the Trustee of the freeze and requesting direction from the Trustee; or, should the Bank have closed the account immediately and delivered the funds in the form of a check or wire transfer to the Trustee? Section 542(b) allows the Bank to do either because of that provision's "shall pay such debt to, or on the order of, the trustee" language; whereas § 542(a), if it applies, requires the Bank to immediately transfer the funds to the Trustee because of that provision's "shall deliver to the trustee" language. Accordingly, if the Bank wants to minimize its exposure

to Chapter 7 trustees to the fullest extent, the Bank should change its present policy from one of freezing and requesting direction to one of immediately closing and delivering.

The Court wishes to point out, however, if the Bank chooses to modify its policy, it may draw fire from some, if not many, Chapter 7 trustees. Some trustees would doubtless express disenchantment with receiving checks from a bank prior to reviewing the debtor's schedules and holding the first meeting of creditors. These trustees would take umbrage at having to establish a separate account for each check received from a bank. They would complain about the administrative costs of having to establish multiple accounts and keeping track of these accounts for audit purposes. If the Bank is to change its policy to close and deliver, it may well be that the most appropriate approach for maintaining cordial relations with Chapter 7 trustees is to establish a floor on the amount in any depositor/debtor's account that the Bank will immediately deliver to a trustee.[15]

In sum, the Bank has to weigh several factors in deciding whether to change its policy. If it chooses to maintain its present policy, then it will probably draw more motions such as the one filed by the Debtors. However unmeritorious such motions may be, the Bank will incur attorneys' fees and costs in defending itself, and will doubtless suffer in its public relations. Moreover, under its present policy, if the Bank mistakenly allows a debtor to use the funds even after freezing them—a scenario which in this Court's experience is not wholly unusual—the Bank will likely draw a suit from the trustee. If the Bank modifies its policy to close accounts and deliver funds to the trustees, the Bank will probably draw fewer suits from debtors. Instead, debtors will focus their energies on communicating with trustees in an effort to convince them to quickly release the funds because they are exempt. However, the Bank may draw a hostile reaction from some trustees who abhor any increase in administrative costs; and the Bank will undoubtedly have fewer balances on deposit, which is the lifeblood of any bank. It is not this Court's place to issue a ruling as to what policy the Bank should pursue. All this Court will do— and all this Court is empowered to do—is to hold that in the case at bar, the Bank is not liable to the Debtors regardless of whether § 542(a) or § 542(b) applies.

This Court cannot close without expressing its disappointment with the response of the Trustee to the Bank's letters in the case at bar. When the Bank sent the Trustee a copy of its

---

[15] This Court would note in passing that with respect to the Bank's present policy of administratively freezing accounts, the Bank's floor of $5,000.00 is quite high. The Court is aware of certain trustees who would file suit to recover much lesser amounts.

18

April 18 letter to the Debtors (informing them of the freeze and of the Bank's need to hear from the Trustee as to what to do with the funds), the Trustee gave no response. Then, when the Bank, having heard nothing from the Trustee since copying him on the April 18 letter to the Debtors, followed up with a letter directly to the Trustee ten days later, the Trustee responded with a somewhat threatening one sentence response: "Please furnish me case authority that gives Wells Fargo Bank a right to freeze the Debtors' bank account when it is not owed anything". The Trustee's response said nothing about what the Bank should do with the funds. According to the Bank's counsel, when he contacted the Trustee about these letters, the Trustee stated that the Bank might be exposing itself to a class action suit over its freeze policy and that the Trustee was not going to make a decision as to what to do with the funds until the first meeting of creditors. (Trans. p. 20, line 23 through p. 21, line 22) (*See* ¶10, in Statement of Facts above).

This Court believes that the Trustee's response was inconsistent with his duties to collect assets of the estate pursuant to § 704(1). *In re Bidlofsky*, 57 B.R. at 900 (holding that when "a bank account that is clearly property of the estate [exists], a trustee breaches that obligation when for nearly four months after notice of the account, all the trustee does is send a letter requesting a freeze.") By first refraining from responding at all, and then responding in a tone that suggested a class action suit might be forthcoming, all the while refusing to make any decision about the funds, the Trustee did little to fulfill his duty to collect assets of the estate and did much to raise the Bank's suspicion about the desire of the Trustee to pursue litigation. Is it any wonder that the Bank is worried about drawing suits from Chapter 7 trustees? The Trustee in the case at bar was fortunate that the Bank did not simply close the account and hand deliver a check to him at his office, an act which certainly would have relieved the Bank from all exposure and required the Trustee to establish a separate account and deal with the Debtors himself. This Court would hope that in the future, the Trustee would respond in a manner that is more consistent with his duty to collect assets of the estate and less belligerent with a financial institution that is acting responsibly in attempting to comply with the Bankruptcy Code.

For the foregoing reasons, the Court denies the Motion in its entirety. This opinion constitutes the Court's findings of fact and conclusions of law[16] pursuant to FED. R. CIV. P. 52,

---

[16] To the extent that any finding of fact is construed to be a conclusion of law, it is hereby adopted as such. To the extent that any conclusion of law is construed to be a finding of fact, it is hereby adopted as such. This Court reserves the right to make additional findings and conclusions as necessary or as may be requested by any party.

as incorporated into contested matters in bankruptcy cases by FED. R. BANKR. P. 9014(C) AND 7052. The Court will issue a separate order consistent with this memorandum opinion.

SIGNED this 25th day of August, 2005.

Jeff Bohm
United States Bankruptcy Judge

cc:

    (1)    Bernard Brooks
            4800 Sugar Grove Blvd., Suite 610
            Stafford, Texas   77477
            (281) 240-1829 (fax)

    (2)    William Greendyke
            1301 McKinney, Suite 5100
            Houston, Texas   77010
            (713) 651-5246 (fax)

    (3)    Ronald J. Sommers
            2800 Post Oak Blvd., #61
            Houston, Texas   77056
            (713) 892-4800 (fax)